AGRIMERICA, INC., Plaintiff-Appellant, v. VERNON L. MATHES *et al.*, Defendants-Appellees.

First District (2nd Division) No. 1—89—0653

Opinion filed May 22, 1990.—Rehearing denied August 6, 1990.

Vedder, Price, Kaufman & Kammholz, of Chicago (Richard F. Zehnle and Jeannine M. Pisoni, of counsel), for appellant.

Tenenbaum & Senderowitz and Martin Cohn & Associates, both of Chicago, and David E. Stahl, of Marietta, Georgia (Marvin Tenenbaum, Steven Daily, and Randall Server, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:
The circuit court found that defendants Vernon C. Mathes (Mathes) and FMF International, Inc., previously known as Far-Mor (Far-Mor), respectively, did not breach a restrictive covenant not to

compete; did not induce a breach of the covenant; and denied plaintiff Agrimerica, Inc. (Agrimerica), injunctive and monetary relief. Agrimerica appeals, raising as issues whether the circuit court erred in finding that (1) the restrictive covenant was unenforceable; (2) Agrimerica breached its employment agreement with Mathes; (3) Mathes did not violate the restrictive covenant; (4) Far-Mor did not intentionally interfere with Mathes' contract with Agrimerica; and (5) Agrimerica did not prove that it suffered damages as a result of defendants' actions. Agrimerica also claims the circuit court abused its discretion in not entering an injunction prohibiting defendants from soliciting plaintiff's customers in the three-State region covered in the restrictive covenant, and abused its discretion in not ordering an accounting of all sales made by defendants to Agrimerica customers in violation of the restrictive covenant. The case is on appeal for a second time (see 170 Ill. App. 3d 1025, 524 N.E.2d 947). Only those record facts necessary for understanding and disposition will be repeated here.

Agrimerica produces "specialty" ingredients, flavoring additives, mold inhibitors and surfactants, which are not absolutely necessary for the growth of animals, but are designed to make animal feed more palatable and encourage better growth. Because specialty products are not yet widely accepted in the animal feed industry, new customers must be developed and persuaded of the need for them. Agrimerica utilized research and assistance to customers in achieving meaningful results. It spent over $700,000 on research and development toward these ends between 1985 and 1986.

On October 23, 1984, Agrimerica hired Mathes as its sales representative in the States of Florida, Georgia, and Alabama. Never before had he sold flavoring additives, mold inhibitors or surfactants in this geographical area. Mathes was first trained by Agrimerica's sales manager before being allowed to call upon customers. Also, he was given the preceding year's call reports, prepared by Agrimerica's previous representative in the territory, which documented certain customer information for Agrimerica's use. When his training was completed, Mathes was accompanied on his sales calls in his assigned territory by Agrimerica's sales manager, who introduced him to key personnel of existing and potential Agrimerica customers. Mathes also periodically received additional sales and technical training from Agrimerica personnel thereafter, assisting him to identify and correct problems with specialty products experienced by his customers.

Mathes did not sign the agreement embodying the restrictive covenant at issue here until December 17, 1984. The first copy, sent by

mail, apparently was not received by him. The second copy was given to him for signature when he later came to Agrimerica's home office in Illinois for a sales meeting. The agreement contained the following covenant in which Mathes promised:

"Following the termination of Employee's employment by Agrimerica for any reason (including resignation), for a period that is the lesser of 24 months he/she was employed by Agrimerica, Employee will not in any way, directly or indirectly (as detailed in the preceding paragraph), promote, sell or attempt to sell, in the Sales Region, any product or service that is in any way competitive with Agrimerica's Business to any person or entity that has been a customer of Agrimerica within two years prior to the date on which Employee's employment with Agrimerica terminated."

Mathes served as Agrimerica's salesman in the three-State area until his termination on March 30, 1987, following a restructuring of the company's sales department. Although offered sales positions with six different companies, only one, Far-Mor, was involved in sales competition with Agrimerica in the same territory Mathes previously served. In fact, Mathes represented to Far-Mor's president, David Decker, that he had developed close personal relationships with some of Agrimerica's customers whom he had served and thought he could switch them over to Far-Mor. In late May 1987, Far-Mor hired Mathes to sell its products primarily in Georgia, Florida, Alabama, and Mississippi, in part because of customer contacts he developed during his employment with Agrimerica. Mathes thereafter solicited orders from certain customers he had serviced previously while employed by Agrimerica.

On July 20, 1987, Agrimerica filed a verified amended complaint and a separate motion for a temporary restraining order. The amendment iterated the allegations of its original complaint and expanded its requested relief to include (1) a temporary restraining order and both preliminary and permanent injunctions to enjoin Mathes from breaching the terms of his employment agreement and from disclosing confidential information learned while employed by Agrimerica; (2) an accounting; and (3) money damages. As to Far-Mor, Agrimerica sought (1) a temporary restraining order and both preliminary and permanent injunctions to enjoin Far-Mor from interfering with the employment agreement, inducing or encouraging Mathes to breach that agreement, and using any confidential information learned from Mathes regarding Agrimerica operations; (2) an accounting; and (3) money damages.

Far-Mor filed its answer to the amended complaint that same day, and admitted Mathes' hiring and his subsequent contacts with his former Agrimerica customers in his new capacity as a Far-Mor representative. Far-Mor denied, however, the existence of Agrimerica's alleged proprietary interest in its customers. It also raised several affirmative defenses, including (1) the amendment failed to state a claim for which relief could be granted; and (2) the employment agreement between Agrimerica and Mathes was unenforceable as against public policy. It did not raise a defense based upon justification. Far-Mor's response to the motion for a temporary restraining order repeated Far-Mor's answer and affirmative defenses and sought denial of the motion.

The circuit court denied the motion for a temporary restraining order and set a date for a preliminary injunction hearing on July 20, 1987. At the July 20 hearing, Mathes, a Georgia resident, moved unsuccessfully to quash the amended complaint for lack of personal jurisdiction. Mathes' answer, filed on August 4, 1987, denied the validity and the enforceability of the employment agreement; sought dismissal of the amended complaint; and raised several defenses and counterclaims.

Following an evidentiary hearing on August 19, 1987, the circuit court granted defendants' motion for a finding and entered an order denying the motion for a preliminary injunction. An appeal to this court followed, and the cause was reversed and remanded in an opinion filed on May 10, 1988. (*Agrimerica*, 170 Ill. App. 3d 1025, 524 N.E.2d 947.) This court ruled that the evidence presented at the preliminary hearing was *"more than adequate* to raise a fair question as to the existence of a proprietary interest in Agrimerica's customers which may be subject to legal protection and a likelihood of success of seeking injunctive relief," and upon remandment, the circuit court was *to continue the hearing* so as to *"allow defendants* to offer evidence in their cases." (Emphasis added.) 170 Ill. App. 3d at 1036.

All parties subsequently agreed to a trial on the merits of all Agrimerica's claims and Mathes' counterclaim.[1] From November 16 to 18, 1988, the circuit court conducted the trial. It is important to note that the parties stipulated to incorporating testimony from the preliminary hearing conducted on August 19, 1987, as part of the 1988 trial evidence, and so advised the court. A substantial part of the evidence

---

[1]On November 18, 1988, Mathes' motion to dismiss his counterclaim pursuant to section 2—1009 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1009) was granted.

took the form of excerpts from depositions.

At the conclusion of the trial and upon consideration of the post-trial briefs, the circuit court issued a written opinion containing findings of fact, a memorandum of law, and its dispositive order. The court's findings of fact included the following: (1) The noncompetition agreement was signed by Mathes without additional consideration. (2) The noncompetition agreement was not ancillary to any other agreement. (3) Agrimerica did not have any legitimate protectable business interest or reason to require Mathes to sign the agreement. (4) Agrimerica did not have long term, near permanent relationships with its customers since the industry was "highly competitive" and customers were motivated by "price considerations" and "product quality" in determining purchases. (5) Agrimerica's claim to have had customers for as long as 30 years was not supported by "credible evidence." (6) Agrimerica did not lose business to Far-Mor as a result of any wrongful conduct by Far-Mor or Mathes. (7) Agrimerica's actual sales history supported a finding of lost profits. (8) Agrimerica's attempt to show lost profits through "projections" of future sales to four customers was "totally insufficient." The circuit court entered judgment in favor of defendants and denied Agrimerica either monetary or injunctive relief.

By timely notice of appeal, Agrimerica challenges the circuit court's findings and order denying injunctive relief and damages.

## I

Agrimerica initially contends that the restrictive covenant in Mathes' employment agreement is enforceable and that the circuit court erred by finding it unenforceable because (1) it was not ancillary to a valid employment agreement; (2) coercion was exercised upon Mathes at the time of signing; and (3) Agrimerica failed to show a protectable business interest.

## A

Whether a restrictive covenant is enforceable or not is a question of law. (*Corroon & Black of Illinois, Inc. v. Magner* (1986), 145 Ill. App. 3d 151, 162, 494 N.E.2d 785 (*Corroon & Black*).) Illinois courts favor fair competition in business and do not encourage restraints of trade; therefore, restrictive covenants are closely scrutinized. (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 237, 445 N.E.2d 418.) Valid consideration, on the part of both parties, is one of the essential requirements for the formation of a contract; an executory contract without consideration is unenforceable either at

law or in equity. (*Corroon & Black*, 145 Ill. App. 3d at 162.) Continued employment for a substantial period, however, is sufficient consideration to support an employment agreement. *McRand, Inc. v. van Beelen* (1985), 138 Ill. App. 3d 1045, 1055, 486 N.E.2d 1306 (*McRand*).

■ Mathes was hired on October 23, 1984; the restrictive covenant was signed in December 1984. According to William Tribble, chief executive officer of Agrimerica, the delay in signing the agreement was the result of Mathes' copy being lost in the mail; therefore, he was allowed to sign it at a subsequent sales meeting. Further, Agrimerica did not discharge Mathes until more than two years later, March 31, 1987. This period constituted continued employment, which served as consideration sufficient to support the agreement. (*McRand*, 138 Ill. App. 3d at 1055.) The circuit court's finding to the contrary was in error.

B

Agrimerica also challenges the circuit court's finding that the agreement was signed through the use of coercion, thereby rendering it unenforceable.

■ Under certain circumstances restrictive covenants are contracts of adhesion because the employee is without any meaningful bargaining power. *Jefco Laboratories, Inc. v. Carroo* (1985), 136 Ill. App. 3d 793, 483 N.E.2d 999; see also *American Food Management, Inc. v. Henson* (1982), 105 Ill. App. 3d 141, 145-46, 434 N.E.2d 59.

At bar, the circuit court found that Mathes was in "a substantially weaker bargaining position" when presented with the noncompetition covenant. Tribble swore that all salesmen sign the covenant and that it is "not negotiable." Further, if a prospective employee does not sign the document, Agrimerica will not hire him. Mathes testified that, at the time of his hiring in October 1987, he did not sign any papers and was unaware of the covenant until it was handed to him at the December sales meeting. He averred that he signed it because if he did not, he could no longer work for the firm. He also indicated that he had turned down other offers of employment in order to accept Agrimerica's offer.

Upon cross-examination, Mathes acknowledged receipt of the employee handbook on the day he was hired. Although the handbook does not contain the specific covenant language, it informed Mathes of the requirement to sign the covenant, as follows:

> "*Confidential Information*
> All employees are required to sign a trade secret/non-compete

agreement as a condition of employment. The purpose of this agreement is to protect product formulations and other proprietary information."

■■ The record is totally devoid of any evidence that Mathes was induced to sign the agreement under circumstances depriving him of the exercise of his own free will (*Higgins v. Brunswick Corp.* (1979), 76 Ill. App. 3d 273, 395 N.E.2d 81; *Kaplan v. Keith* (1978), 60 Ill. App. 3d 804, 377 N.E.2d 279), nor is there any evidence of fraud or wrongdoing. (*Higgins v. Brunswick Corp.*, 76 Ill. App. 3d at 277.) Although claiming he was "uncomfortable" in signing the agreement and felt that he was being "told what to do," nothing in the record shows that he sought to question or negotiate its terms. He had been offered jobs by three other firms; the record is silent as to whether they were or were not still available to Mathes when asked to sign the covenant. The record does show, however, that he accepted employment with Agrimerica because it offered him a "considerably higher salary."

The circuit court's conclusion that the agreement was signed by Mathes while under duress is without record foundation and was erroneous.

C

Agrimerica further argues that the circuit court erred in finding that it did not prove the existence of a protectable interest.

■■ A restrictive covenant in an employment agreement will be upheld if it is reasonable in geographical and temporal scope and it is necessary to protect a legitimate business interest of the employer. (*Morrison Metalweld Process Corp. v. Valent* (1981), 97 Ill. App. 3d 373, 482 N.E.2d 1034.) The interest of the employer in such cases is in retaining its present customers in circumstances where the employee's contacts and relationships with those customers engenders a substantial risk that the employee will be enabled to divert part of or all the employer's business to the employee's self-interest. (See Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 657 (1960).) To prove such a legitimate business interest, Illinois courts require that the employer have a near permanent relationship with its customers; and that but for the employment, the employee would not have had contact with the customers. *McRand*, 138 Ill. App. 3d at 1051.

Relying upon *A.B. Dick Co. v. American Pro-Tech* (1987), 159 Ill. App. 3d 786, 793, 514 N.E.2d 45, and *McRand* (138 Ill. App. 3d at 1051-53), this court, in its earlier opinion, set forth objective factors

which, upon remandment, would aid in determining whether a near permanent relationship existed, namely "(1) the number of years required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customers' association with the employer; and (7) the continuity of employer-customer relationships." *Agrimerica*, 170 Ill. App. 3d at 1032.

■ As to the first factor, in the case *sub judice*, Kurt Marquardt, director of sales at Agrimerica, testified that it is nearly impossible to make a sale on the first call to a customer; salespeople need 6 to 12 months to establish credibility and confidentiality with a prospective customer and to persuade him to buy a new product. For defendants, David Decker, Far-Mor's president, averred that to get started, a salesperson must make an initial call on the customer to ascertain whether there is a real need for the product and convince him to give Far-Mor's product a "try." Although he stated that this process can take anywhere from 1 day to 20 years, it appears that getting a customer to give a product a "try" could mean anything from accepting a sample to engaging in a test, or it may mean making a sale. Decker's testimony in this regard is nebulous. It does not refute the assertion as to lead time required for developing a prospect into a purchaser. Ronald Kennedy, purchasing manager of Sunshine Mills, first testified for defendants that his employer "went to using *** [Agrimerica] pretty quick" after their first sales contact, but conceded ignorance as to whether that period could have been from less than six months to more than one year. The circuit court's finding that "[c]ustomers can be obtained on the basis of a single sales call" is without record support.

Addressing the second factor, company investments to develop its client base, Marquardt and William Tuttle, Agrimerica's director of technical services, explained a two-step process necessary to attract customers, namely, a perceived need for the product must be created in the customer's mind, and research data must be formulated to show, empirically, the satisfaction of that need. Tribble, Agrimerica's president, averred that the company spent approximately $300,000 in 1985 and $400,000 in 1986 on research. This evidence was noted and relied upon in the first appeal (*Agrimerica*, 170 Ill. App. 3d at 1032, 1035), as well as by the parties as stipulated evidence at the continued hearing. Defendants offered no evidence to contradict this testimony. Failure to produce relevant evidence to show the existence of a contrary alternative leaves the finding in the first appeal intact and un-

controverted. Such evidence cannot be ignored on remand. (See *Nationwide Advertising Service, Inc. v. Kolar* (1975), 28 Ill. App. 3d 671, 329 N.E.2d 300.) The circuit court erred in having done so here.

Evidence relating to the third factor, the degree of difficulty in acquiring clients, included Marquardt's testimony that it was "nearly impossible" to make a sale on a first call to a customer and that he never heard of this happening to the industry. He stated, further, that Agrimerica does not attempt to displace a competitive product in its first stages of contact with a customer, but tries to sell a product which the customer is not then using. To counter this testimony, Decker asserted that Far-Mor has been able to take away business from competitors with ease; however, he was unable to identify any such success, aside from one unnamed customer in a period of 1½ years, with whom Mathes was not previously involved when employed by Agrimerica. The circuit court's finding, that "[c]ustomers in the mold-inhibitor and feed flavoring industry are no more difficult to obtain than in any other market," presupposes that evidence involving other markets, and the relative ease or difficulty in securing customers therein, was before the court. No such evidence was introduced, however. Further, evidence of difficulty presented by Agrimerica was hardly refuted by the recitation of one anonymous instance in an 18-month period. This is particularly significant since Far-Mor's products are "considerably lower priced" when compared to Agrimerica's pricing, according to Far-Mor's own evidence. The circuit court's finding with respect to this factor was against the manifest weight of the evidence.

The next factor to be considered is the extent of personal customer contact by the employee. Marquardt testified that Agrimerica sales representatives contact established customers approximately once per month; potential customers receive fewer calls. All client contact, whether by telephone or in person, is recorded in company "call reports." Mathes admitted that each of the approximately 510 call reports he completed during his tenure at Agrimerica represented at least one call per customer. He agreed that he was the "key contact" between Agrimerica and its customers and developed "close personal relationships" with some of them. In addition, one of Agrimerica's exhibits revealed that Mathes visited one customer's plant 37 times in 28 months; another 26 times in 27 months; and still another 28 times in 29 months. Defendants' witnesses, Charles Baldwin, W.B. Fleming's president, and Kennedy of Sunshine Mills, both testified that their primary contact with Agrimerica was with Mathes, with whom they developed a "good relationship" and became "really good friends."

In light of the foregoing, it is difficult to understand the circuit court's finding that "salesmen for Agrimerica ***, including Mathes, did not have intensive contact with Agrimerica's customers." This finding simply is without foundation in the evidence and was in error.

In consideration of the fifth factor, the extent of the employer's knowledge of clients, our previous opinion noted:

> "Agrimerica's knowledge of its customers extends beyond information gathered for research purposes, according to the evidence. For example, Marquardt stated that the company's sales trainees receive data concerning their customers' prior relationship with Agrimerica; learn how to demonstrate Agrimerica ingredients; and learn to act as 'troubleshooters,' identifying and correcting problems clients develop with the specialty items. Furthermore, Mathes received four or five days of initial training at the Northbrook office before embarking on any sales calls and was accompanied for an additional week by his sales manager, who introduced Mathes to 'key personnel' of existing Agrimerica customers." (*Agrimerica*, 170 Ill. App. 3d at 1033.)

In addition, and as mentioned above, written company call reports are required of Agrimerica's sales personnel, which contain information about customers, including their product formulations, sales, problems, equipment, competition and their day to day operations. These reports advise Agrimerica of "what is going on [with the customers] *** so that if *** [Agrimerica] has to get back to them *** [the company] has a record" of previous discussions. This evidence was unrefuted by Far-Mor.

The circuit court found that "[o]ther than through its salesmen, Agrimerica's management does not and did not have extensive involvement or knowledge of its customers." Such a finding could have been made only by disregarding the foregoing record evidence and clearly is in error.

The next factor applicable in the "near permanent relationship" formula is the duration of customers' associations with the employer. Agrimerica's president, Tribble, testified that based upon his knowledge of regularity of purchases by customers of long duration, several Agrimerica customers had purchased from Agrimerica for more than 30 years. Further, 75% of Agrimerica's sales are to purchasers who have been customers for five or more years. Although cross-examined by the attorneys for each defendant, in no instance was Tribble's testimony on this point questioned. Defendants' challenge to this evidence showed that of the four companies cited by Agrimerica as ex-

amples of lost profit customers, the duration of customer associations ranged from two years, four months to one week. This time, however, was measured to the period when Mathes' covenant-violating activity commenced, which denied further duration to the association. Parenthetically, it should be noted that Agrimerica required more than two years and in excess of 16 sales calls to develop W.B. Fleming as a customer, an association that lasted but one month after the first sale, at which time Mathes was terminated.

Far-Mor's president, Decker, testified that Far-Mor constantly works to keep its customers in a highly competitive industry. He did not relate the length of time Far-Mor has maintained its relationship with its customers. The feed flavor and mold inhibitor markets are becoming increasingly more competitive, according to Decker, because of new entrants into the field. On cross-examination, however, he admitted that there has been only one new entrant into the flavor field in the previous two years, and only one to three new entrants into the mold inhibitor field in the same period.

Ormund Isaacson testified for defendants on this subject. He introduced Mathes to Agrimerica for employment and had been associated with him in previous employment. Both he and Mathes were discharged by Agrimerica on the same day. At the time of the hearing, Isaacson was a defendant in an Agrimerica lawsuit for violating his own noncompetition covenant. His testimony concerning four customers developed exclusively in Mathes' territory led to the erroneous finding by the circuit court, that "these four customers properly reflect Agrimerica's actual relationship with its customers." As noted in the first appeal, the question of continuity extends beyond a single territory and into patterns identifiable in the industry.

As earlier mentioned in this regard, Tribble testified that 75% of Agrimerica's dollar sales volume is attributable to patrons who have been Agrimerica's customers for over five years. Tribble was not cross-examined as to this evidence, and it was unchallenged. Tribble had been involved in the industry for over 25 years and was employed by Agrimerica for 17 years. It was error to summarily discount and disregard such evidence. The further finding, that two of the customers left Agrimerica "for price or quality of product considerations," overlooks the fact that these were among the customers who were solicited by Mathes and that, notwithstanding its lower price, Far-Mor was unable to take away other customers not connected to Mathes, except one, which was unnamed. Agrimerica's evidence relating to this factor also supports the factor concerning continuity of customer relations.

The conclusion of the circuit court as to these factors is contrary to the manifest weight of the material evidence and must be reversed.

Near permanent customer relationships also require a showing that, but for the employment in question, the employee would not have come into contact with the employer's customers. (*McRand*, 138 Ill. App. 3d at 1053.) Mathes had never sold animal feed products in Georgia, Florida or Alabama before his employment with Agrimerica, and he was given Agrimerica's previous year's call reports prepared by their preceding representative in the territory, documenting customer information for Mathes. Also, he was accompanied by Agrimerica's sales manager, who introduced him to key personnel of existing and potential Agrimerica customers. There is no claim that Mathes brought any customers with him when he first began employment with Agrimerica. Agrimerica's evidence, unchallenged as to this factor, should not have been rejected by the circuit court.

Based upon the record evidence, the circuit court's determination that Agrimerica did not prove near permanent relationships, and thereby a legitimate and protectable business interest, is against the manifest weight of the evidence and is reversed.

## II

The circuit court also ruled that Agrimerica breached its contract with Mathes when it terminated his employment, rendering the noncompetition agreement unenforceable. That agreement states that it becomes effective following an employee's termination "for any reason." The circuit court, however, found that Mathes was terminated without cause, apparently making good faith an implied contractual term. Contracts require that both parties promise to act in good faith (*Osten v. Shah* (1982), 104 Ill. App. 3d 784, 786, 433 N.E.2d 294), which has been implied as a contractual term of a restrictive covenant. See *Rao v. Rao* (7th Cir. 1983), 718 F.2d 219.

■■■ That Mathes' employment was one at will is undisputed. Such employment may be terminated at any time and for any reason. (*Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 525, 478 N.E.2d 1354; *Ryherd v. General Cable Co.* (1988), 124 Ill. 2d 418, 427, 530 N.E.2d 431.)[2] At bar, Agrimerica dismissed Mathes following a reorganization of its sales department. There was no viable evidence that he was fired for any other reason. The requirement of good-faith dealing here did not convert an at-will relationship into some other contractual association.

---

[2]Except for retaliatory discharge cases, discussed in *Barr* (106 Ill. 2d at 525).

The circuit court's finding that Agrimerica breached its contract with Mathes is without basis in law or fact and must be reversed.

## III

Agrimerica also assigns as error the circuit court's finding that Far-Mor did not intentionally interfere with Mathes' contract with Agrimerica.

The elements of tortious interference with a contract are (1) the existence of a valid and enforceable contract between plaintiff and another; (2) the awareness on the part of the defendant of the contractual relation; (3) defendant's intentional and unjustified inducement of the breach of the contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages. *Corroon & Black*, 145 Ill. App. 3d at 167; *Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 551, 413 N.E.2d 98 (*Belden Corp.*).

At the hearing on the petition for a preliminary injunction, Decker testified that, before hiring him on May 21, 1986, he knew Mathes had signed a restrictive covenant with Agrimerica and saw a copy of that covenant by June 1987. Mathes was hired by Far-Mor mainly to service customers in Alabama, Florida and Georgia, the very regions that he had been assigned to develop during employment by Agrimerica. Mathes represented to Decker that he had close relationships with individuals who were employees of Agrimerica's customers and thought he could get some to switch to Far-Mor. Decker believed that Mathes' contacts would help sell Far-Mor products to them. Indeed, Mathes was to receive a bonus for "new business," including products sold to his former Agrimerica customers. Decker was aware of Mathes having solicited business from these Agrimerica customers for Far-Mor, and he encouraged Mathes to do so. He never told Mathes not to call on or sell to customers to whom Mathes previously sold Agrimerica products.

The circuit court found no malicious inducement of contract breach because Agrimerica had no protectable interest in the Mathes-solicited former Agrimerica's customers.

With respect to the requirement of malice, mentioned by the circuit court here, the term is often included as an element for tortious interference with a contract, but simply means an attempt to interfere without sufficient justification. (*Belden Corp.*, 90 Ill. App. 3d at 552 n.2.) Evidence of ill-will, spite or hatred is not required. (*Lord v. Melton* (1980), 80 Ill. App. 3d 1057, 1060, 400 N.E.2d 547; *Marcus v. Wilson* (1973), 16 Ill. App. 3d 724, 306 N.E.2d 554; *Worrick v. Flora* (1971), 133 Ill. App. 2d 755, 758, 272 N.E.2d 708.) Justification

in this context is an affirmative defense. (*Zamouski v. Gerrard* (1971), 1 Ill. App. 3d 890, 897, 275 N.E.2d 429.) The facts constituting affirmative defenses must be pleaded and proved by the party raising such defenses. (Ill. Rev. Stat. 1987, ch. 110, par. 2—613(d).) Far-Mor has neither pleaded nor proved justification in this case. Decker, its president, testified that he knew Mathes had signed a restrictive covenant with Agrimerica; that Mathes had close relationships among Agrimerica's customers; and that he "encouraged [Mathes] to contact as many people, no matter who they bought from" before, on behalf of Far-Mor.

The circuit court's finding an absence of tortious interference by Far-Mor, in light of the foregoing, is against the manifest weight of the evidence and will be reversed.

IV

Agrimerica next asserts that the circuit court abused its discretion in denying injunctive relief necessary for Agrimerica to win back its former customers from Far-Mor.

Agrimerica notes that Mathes was separated from Agrimerica on March 30, 1987. During this period he did not observe the restrictive covenant. Agrimerica argues that it would be inequitable to allow Mathes and Far-Mor to profit from the illegal activity in which Mathes engaged, and which Far-Mor encouraged, by permitting them to retain the customers that Mathes illegally procured for Far-Mor. Agrimerica requests the entry of a final injunction, enjoining for a period of two years both Mathes and Far-Mor from soliciting sales from or selling products to those previous Agrimerica customers to whom Mathes sold products during the two years following termination of his employment at Agrimerica.

No case is cited specifically considering the issue raised here; however, Agrimerica relies upon *Brunswick Corp. v. Outboard Marine Corp.* (1980), 79 Ill. 2d 475, 404 N.E.2d 205 (*Brunswick*), in which an issue with reference to an appropriate remedy for improper use of a trade secret was raised. Affirming its earlier decision in *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865, the supreme court held that the injunction there entered should extend through the period of time necessary for defendant to copy or develop the trade secret by lawful means. Another decision, *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393, was also affirmed in *Brunswick*, in which the court required an injunction to run from the date of the injunction order and not the date that the trade secrets were wrongfully acquired. The supreme court explained

that under such circumstances, the developer of the trade secret should be placed in the same position it would have occupied absent the breach and the restraint, consistent with the other objectives placed upon competitors and the utilization of the competitors' and employees' skills. (*Brunswick*, 79 Ill. 2d at 479-80.) The present case, however, does not involve trade secrets.

In the first appeal of this case, we noted, in discussing an appropriate remedy (*Agrimerica*, 170 Ill. App. 3d at 1035):

"In addition, continued contacts by Mathes *could* result in damage extending far beyond the time restriction enunciated in the covenant; *the two years needed to solidify initial customers relationships may* be again required *to win back* a former client lost to Far-Mor as a result of Mathes' advances." (Emphasis added.)

 █ There is no evidence found in this record with respect to the length of time Agrimerica needed to *reestablish* or *"win back"* customer relationships severed by the conduct of either Mathes or Far-Mor. In determining the reasonableness of a proposed continuance of such restraint of trade, to be considered are (1) potential public harm through lack of competition; (2) undue hardship to the promisor; and (3) whether the restraint imposed is greater than necessary to protect the promisee. (*House of Vision, Inc. v. Hiyane* (1967), 37 Ill. 2d 32, 37, 225 N.E.2d 21; *Dryvit System, Inc. v. Rushing* (1985), 132 Ill. App. 3d 9, 12, 477 N.E.2d 35.) Absent the foregoing evidentiary bases upon which to consider the reasonableness of the proposed "final" restraint, we cannot order entry of a two-year injunction on this record. On remand, the circuit court should consider such further evidence as may be adduced by the parties in consonance with the foregoing enumerated premises and enter appropriate orders with respect to any relief such evidence may justify. (*McRand, Inc. v. van Beelen*, 138 Ill. App. 3d at 1058; *Donald McElroy, Inc. v. Delaney* (1979), 72 Ill. App. 3d 285, 295, 389 N.E.2d 1300.) Also to be considered is the effect that the passage of time may have had upon the parties' interests since the initial violation of the agreement. See *Shapiro v. Regent Printing Co.* (1989), 192 Ill. App. 3d 1005, 1013, 549 N.E.2d 793.

The denial of injunctive relief is reversed and remanded for further hearing.

## V

Agrimerica contends the circuit court erred in not ordering Far-Mor to account for its sales to Agrimerica's customers.

Whether a party has established a cause of action for an accounting is a question of fact for the circuit court, and its finding on that question will not be disturbed unless it is against the manifest weight of the evidence. (*Ferrera v. Collins* (1983), 119 Ill. App. 3d 819, 457 N.E.2d 109.) The circuit court has the discretion as to whether an accounting should be ordered; there are no guidelines for determining when an accounting is warranted because the need for such relief is dependent upon the particular facts of each case. *Ferrara*, 119 Ill. App. 3d at 822; *Bung-Orn Netisingha v. End of the Line, Inc.* (1982), 107 Ill. App. 3d 275, 278, 437 N.E.2d 857.

A review of the record indicates that the circuit court was presented with sufficient, albeit contradictory, evidence to render a decision as to whether an accounting was necessary, or not. We will not disturb its judgment in this regard.

## VI

Agrimerica's final argument is that the circuit court improperly denied it monetary damages for the reason that Agrimerica produced insufficient proof of lost profits.

In order to successfully maintain a claim for lost profits, the evidence must show a loss with a reasonable degree of certainty and the wrongfulness of the opposing party's act causing the loss. (*Madison Associates v. Bass* (1987), 158 Ill. App. 3d 526, 542, 511 N.E.2d 690.) A loss need not be proven with absolute certainty; such profits will always be uncertain to some extent and calculation may be incapable of mathematical precision. (*Midland Hotel Corp. v. Reuben H. Donnelly Corp.* (1987), 118 Ill. 2d 306, 315-16, 515 N.E.2d 61.) Although it may be impossible to ascertain the exact amount of lost profits from a breach of a noncompetition covenant, this fact alone is not justification for refusing compensation to the injured party. (*Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, 647, 425 N.E.2d 1060.) In cases of this character, the law requires only that the evidence establish a basis for the assessment of damages with a fair degree of probability. *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 147, 281 N.E.2d 323.

The circuit court found there was no showing by Agrimerica of overall business losses as the result of Mathes' activity. Whether *overall loss* for Agrimerica occurred in the period following Mathes' separation from Agrimerica and his employment by Far-Mor is irrelevant, however, to the question of whether in fact Agrimerica lost profits as a result of Mathes' activities *among its previous customers*. More in point, the circuit court found Agrimerica's proof of lost profits to be

"totally insufficient" because (1) it was based on "blatant hearsay which this Court excluded from evidence," (2) it was based on "a handful of projections," (3) its predictions lacked "credibility," and (4) causation by defendants' wrongful acts was not shown. We have already considered and rejected the theory of Far-Mor's noninvolvement in Mathes' wrongful conduct under part III of this opinion and will not repeat here what was said there.

The evidence concerning damages involved four former Agrimerica customers, each of which was acknowledged to have been called upon by Mathes while employed by Agrimerica and to whom Agrimerica products were sold during that period, namely, Sunshine Mills, W.B. Fleming, Seminole Stores, and Callaway Farms.

Agrimerica's comptroller, Thomas Walser, who possesses an MBA degree, concentrating on finance, testified as to damages Agrimerica sustained due to defendants' conduct. Walser first determined actual past sales for each of the four customers during the time Mathes was employed by Agrimerica. This information was extracted from call reports prepared for Agrimerica by Mathes and from invoices showing actual sales, which were in evidence. He then averaged that total to get a figure representing yearly sales. He also amassed data, introduced into evidence, concerning the amount of product each customer had purchased and averaged it to obtain the average yearly amount the customer would need. He then multiplied that figure by the unit price, deducting any bulk discount for which the customer qualified. The total then was reduced to account for material costs, sales commissions, and freight and shipping costs.[3]

Defendants attempted to counter the foregoing with evidence from depositions given by representatives of two of the four companies Agrimerica previously serviced, but assertedly lost through Mathes' efforts. In both instances, the witnesses testified that they had switched from Agrimerica to other additive suppliers. Kennedy, of Sunshine Mills, testified that his firm was in the process of changing suppliers before Mathes was fired; he "dreaded" telling Mathes this because they had a good relationship; they were switching to Kemin as a result of product testing; and Agrimerica's products were causing corrosion to the company's machinery. The evidence showed, how-

---

[3]Defendants' claim that the figures relating to Sunshine Mills improperly included sales to the Tupelo, Mississippi, plant, which lies outside Mathes' territory, disregards the evidence that the decision to purchase Agrimerica's product was made in Sunshine Mills' Red Bay, Alabama, plant, and the decision to discontinue those purchases was also made in Red Bay, with no participation by Tupelo plant personnel in making that decision.

ever, that the decision to stop purchases from Agrimerica, alleged by Kennedy to have been made in January 1987, was followed by further Agrimerica sales to Sunshine Mills that same year. No transfer of purchases to Kemin took place until 1988; significantly, this was after sales first were made by Far-Mor through Mathes to Sunshine Mills in March 1988. No one representing Far-Mor contacted Kennedy before Mathes did, according to the record.

Kennedy was unable to identify the extent of any corrosion problem caused by Agrimerica and made no effort to find out. Kennedy admittedly was a close friend of Mathes. Worthy of note is the call report authored by Mathes after talking to Kennedy, addressed to Far-Mor, which revealed that on May 21, 1987, the day Mathes began working for Far-Mor, Kennedy told Mathes that Sunshine Mills would be ready to order Far-Mor products in September 1987 and asked Mathes to arrange for tests, the results of which would warrant giving him the order.

Baldwin explained that his firm, W.B. Fleming, had switched from Agrimerica because its prices were too high; his company looks for suppliers who can give it the "best field results and costs"; Mathes' leaving Agrimerica did not influence the decision to switch, economics did; and Fleming was "stormed" by suppliers after it had made a decision to use liquid additive as opposed to dry additive. It was Mathes' solicitation of Fleming during the two-year period of his covenant, however, which led to the sales by Far-Mor during that time over Agrimerica. Indeed, Baldwin, Mathes' friend, admitted that he first heard of Far-Mor through Mathes after Mathes left Agrimerica.

The evidence of lost profits submitted by Agrimerica, based upon actual past sales to and the reasonably projected product usage by the four customers previously serviced by Mathes, including part of 1987, the year of his termination, required the circuit court to award substantial compensation to Agrimerica. The projections, appropriately founded upon past demonstrated profits, established a basis for the assessment of damages " 'with a fair degree of probability' " (*Schatz v. Abbott Laboratories*, 51 Ill. 2d at 148, quoting *Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 289, 115 N.E. 389), and should have been considered by the circuit court in reaching a fair and just conclusion as to damages. Failure to have done so was contrary to the manifest weight of the evidence, which requires reversal and remandment for reevaluation at the trial level. The circuit court may take into account such additional or diminutional factors as changes in the market in general, or Agrimerica's share thereof in particular, shown by the evidence, in the three-State territory previ-

ously serviced by Mathes.

No evidentiary bases appear, however, for projecting an additional year of continuing similar levels of profit. In this regard, as to the claimed third year of projected lost profits, the circuit court correctly considered the state of the evidence as entirely speculative and must be affirmed.

For the reasons set forth above, the decision of the circuit court is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

DiVITO, P.J., and SCARIANO, J., concur.