**APPLIED MICRO, INC., Plaintiff,**

v.

**SJI FULFILLMENT, INC. and Janice Schmitt, Defendants.**

No. 96 C 1936.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 15, 1996.

Gregory A. Braun, David T. Wallach, Wallach & Braun, John L. Malevitis, J.L. Malevitis & Associates, Ltd., Chicago, IL, for plaintiff Applied Micro, Inc.

Sanford Mark Pastroff, Sonnenschein, Nath & Rosenthal, Chicago, IL, Michael A. Vitale, Herzog, Crebs & McGhee, St. Louis, MO, Steven M. Cohen, Selner, Glaser, Komen, Berger & Galganski, P.C., Clayton, MO, for defendant SJI Fulfillment, Inc.

Robert Kaiser Neiman, Rachel Ellen Lutner, Holleb & Coff, Chicago, IL, for defendant Janice Schmitt.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Applied Micro, Inc. brought suit in this Court claiming that its former customer, SJI Fulfillment, Inc. (SJI), and former employee, Janice Schmitt, breached their respective contracts with AMI when Schmitt left the company to work for SJI. Schmitt's employment with SJI allegedly violated her covenant not to compete with AMI by soliciting its customers. Conversely, in employing Schmitt, SJI allegedly breached its written agreement to refrain from hiring AMI employees. The gist of AMI's claim is that it spent time and money training Schmitt to program computers using a specialized language, reposed trust in her as its sole employee proficient in that language, and executed two contracts to protect its investment, only to lose Schmitt when its customer, SJI, transformed AMI's temporary assignment into SJI's permanent employment. Minus Schmitt, AMI has allegedly been unable to provide computer support to customers that purchased programs using the specialized language. As a result, AMI claims, it has lost a substantial chunk of business.

These allegations are incorporated into a three-count complaint. Count One details

SJI's alleged breach of contract. Count Two elaborates on Schmitt's alleged violation of the restrictive covenant. Count Three seeks to hold SJI additionally liable for interfering with AMI and Schmitt's contractual relations.

Currently before this Court is defendant Schmitt's motion to dismiss, which targets only Count Two. Schmitt contends that this count is deficient because the restrictive covenant on which it is based is unenforceable. Her objection to the covenant rests on the sole ground that it is not ancillary to a valid employment contract and, therefore, serves only the impermissible purpose of restraining trade. For the reasons discussed below, we find that the covenant withstands this attack.[1] Accordingly, defendant Schmitt's motion to dismiss is denied.

### RELEVANT FACTS[2]

Schmitt began working for AMI as a computer systems programs analyst on March 30, 1987. Compl. ¶ 3. About a month later, on April 27, Schmitt signed an "Employee Noncompete Agreement." *Id.* ¶ 4. The agreement prohibited Schmitt from soliciting any customers or accounts that belonged to AMI at the time she worked there, for a period of one year following her termination. *Id.* Ex. A. Other than the restrictive covenant, no written employment agreement governed the terms and conditions of Schmitt's employment; her relationship with AMI was purely at-will.

Shortly after Schmitt executed the covenant not to compete, AMI allegedly trained her, at its own expense, in programming using a specialized computer language called "Progress" and its corresponding application, "Varnet." *Id.* ¶ 5. Schmitt was subsequently designated AMI's sole Progress/Varnet programmer, allegedly generating over $200,000 each year in Progress/Varnet sales and service. *Id.* ¶¶ 6–7. For the next five years, Schmitt remained AMI's lone Progress/Varnet-literate employee. *Id.* ¶ 24;

Pl.Resp.Mot.Dismiss at 2. She focused primarily on writing individualized programs in the Progress language for AMI customers and providing them the necessary support services. *Id.*

In May of 1992, AMI executed a sales agreement with SJI to develop for it a customized computer program using Progress/Varnet. Compl. ¶ 8 & Ex. B. In addition to setting forth the parties' obligations with respect to AMI's computer services, the agreement prohibited SJI from offering jobs to AMI employees for two years following its execution. *Id.* ¶ 9 & Ex. B ¶ 11.

Schmitt was immediately assigned to the SJI project. Later that month, she began working on-site at SJI's offices in St. Louis during part of each week to implement the computer system. *Id.* ¶¶ 10–11. This arrangement continued for several months. *Id.* ¶ 12. But on November 16, before Schmitt had completed the project, SJI offered her a full-time job. *Id.* ¶¶ 13–14. One month later, Schmitt accepted the position with SJI, where she remains today. *Id.* ¶¶ 14, 17. All told, Schmitt worked at AMI for five-and-a-half years. *Id.* ¶¶ 3, 14.

AMI claims that by accepting employment with SJI, Schmitt breached her obligation under the noncompete agreement to refrain from soliciting AMI's customers. Schmitt rejoins with the argument that she cannot be held to the noncompete because it is unenforceable under Illinois law. The remainder of this opinion is dedicated to resolving this solitary dispute.

### ANALYSIS

#### I. Legal Standards

Schmitt filed her motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which requires the Court to accept all well-pleaded allegations as true, and draw all reasonable inferences in favor of the plaintiff, AMI. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423,

---

1. The opinion addresses only the objections Schmitt raises in her memoranda.

2. The facts are derived from AMI's complaint, whose allegations we must accept as true in deciding motions to dismiss. *See Doherty v. City*

*of Chicago,* 75 F.3d 318, 322 (7th Cir.1996). Facts contained in AMI's memorandum opposing Schmitt's motion are considered to the extent they are consistent with the allegations. *Dausch v. Rykse,* 52 F.3d 1425, 1428 (7th Cir.1994).

1429 (7th Cir.1996). We are not to dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim warranting relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *R.E. Davis Chem. Corp. v. Diasonics, Inc.,* 826 F.2d 678, 684–85 (7th Cir. 1988). At this early stage in the litigation, these standards guide us in determining the enforceability of Schmitt's covenant not to compete.

The validity of a restrictive covenant is a question of law, and more particularly, of state law. *Agrimerica, Inc. v. Mathes,* 199 Ill.App.3d 435, 441, 145 Ill.Dec. 587, 592, 557 N.E.2d 357, 362 (1st Dist.1990); *Corroon & Black, Inc. v. Magner,* 145 Ill. App.3d 151, 162, 98 Ill.Dec. 663, 669, 494 N.E.2d 785, 791 (1st Dist.1986). The appropriate state law is determined by reference to *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which mandates that federal courts sitting in diversity, as we are here, apply the law of the state in which they are located. Accordingly, Illinois law will govern the enforceability issue.

Illinois courts have devised a test for evaluating the enforceability of restrictive covenants in the employment context. Such covenants are generally enforceable if reasonable in geographic and temporal scope and necessary to protect the employer's legitimate business interest. *Abel v. Fox,* 274 Ill.App.3d 811, 813, 211 Ill.Dec. 129, 131, 654 N.E.2d 591, 593 (4th Dist.1995); *Millard Maintenance Serv. Co. v. Bernero,* 207 Ill. App.3d 736, 744, 152 Ill.Dec. 692, 697, 566 N.E.2d 379, 384 (1st Dist.1990). Before proceeding with a reasonableness analysis, however, the court must make a threshold determination: it must find 1) that the covenant is ancillary to a valid employment contract and 2) that it is supported by adequate consideration. *Abel,* 274 Ill.App.3d at 813–14, 211 Ill.Dec. at 131, 654 N.E.2d at 593; *Creative Entertainment, Inc. v. Lorenz,* 265 Ill.App.3d 343, 346, 202 Ill.Dec. 571, 573, 638 N.E.2d 217, 219 (1st Dist.1994). Continued employment for a substantial period, in the case of a covenant signed after the employee begins work, has consistently been deemed sufficient consideration for the agreement not to compete. *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945–48 (7th Cir.1994); *Abel,* 274 Ill. App.3d at 814, 211 Ill.Dec. at 131, 654 N.E.2d at 593; *Creative Entertainment,* 265 Ill. App.3d at 349, 202 Ill.Dec. at 575, 638 N.E.2d at 221; *Lyle R. Jager Agency, Inc. v. Steward,* 253 Ill.App.3d 631, 635, 192 Ill.Dec. 437, 439, 625 N.E.2d 397, 399 (3d Dist.1993); *Millard,* 207 Ill.App.3d at 745, 152 Ill.Dec. at 697, 566 N.E.2d at 384; *Agrimerica,* 199 Ill.App.3d at 442, 145 Ill.Dec. at 592, 557 N.E.2d at 362.[3] But Schmitt does not take issue with the adequacy of consideration for her noncompete;[4] rather, she questions only whether the agreement is ancillary to a valid employment contract. The Court thus will not examine the covenant's consideration or inquire into its reasonableness.

## II. The Appellate Court Split

Schmitt argues that her noncompete is not ancillary to a valid employment agreement because she was not furnished a contract setting forth the terms and conditions

---

3. For a thorough explanation as to why courts view continued employment as good consideration for a covenant not to compete, see *Curtis,* 24 F.3d at 945–48.

This convention, however, is not without its limits. For example, employment for just seven months after executing a noncompete does not provide the requisite consideration. *See Mid-Town Petroleum, Inc. v. Gowen,* 243 Ill.App.3d 63, 70, 183 Ill.Dec. 573, 579, 611 N.E.2d 1221, 1227 (1st Dist.1993). On the other hand, two to three years' continued employment clearly suffices. *See, e.g., Abel,* 274 Ill.App.3d at 821, 211 Ill.Dec. at 136, 654 N.E.2d at 598 (three years); *Steward,* 253 Ill.App.3d at 635, 192 Ill.Dec. at 439, 625 N.E.2d at 399 (two years); *Agrimerica,*

199 Ill.App.3d at 442, 145 Ill.Dec. at 592, 557 N.E.2d at 362 (two-and-a-half years). We note in passing that Schmitt stayed with AMI for over five years after she signed the restrictive covenant.

4. Schmitt belatedly challenges the noncompete's consideration in her reply memorandum. This argument was waived when it was omitted it from her opening brief. *Wilson v. O'Leary,* 895 F.2d 378, 384 (7th Cir.1990). At any rate, given the clear and copious authority finding continued employment, regardless of whether promised in advance and in writing, to be sufficient consideration for a noncompete, the challenge is unlikely to have succeeded.

of her employment, including its length and her compensation. Indeed, she contends, AMI's failure to promise a specific period of employment in exchange for executing the noncompete alone strikes a fatal blow. Schmitt cites one case in her entire supporting memorandum, the First Appellate District's *Creative Entertainment* decision, in favor of this proposition. But AMI quite correctly points out that *Creative Entertainment* does not comprise the judicial universe on the validity of restrictive covenants, and, in fact, was called into serious question just one year later by the Fourth Appellate District in *Abel v. Fox.* The *Abel* court held that an oral at-will relationship is a valid employment "contract" or "relationship" that complies with the requirement of ancillary. 274 Ill.App.3d at 820, 211 Ill.Dec. at 135, 654 N.E.2d at 597. Written terms and conditions of employment, it decided, are unnecessary to support a noncompete. *Id.* Because *Creative Entertainment* and *Abel* are the only Illinois cases addressing ancillarity, the Court will briefly reprise their facts and reasoning.

In *Creative Entertainment,* the First District struck down a noncompete on ancillarity grounds, and dismissed the count on which it was based, because no written contract specified the defendant's terms and conditions of employment. Defendant Lorenz had been employed at will, and the only written agreement he executed was a noncompete signed eight months after he began working. When Lorenz left to form his own business, and began contacting his former employer's customers in violation of the agreement's provisions, the employer sued to enforce the covenant. Finding the noncompete unenforceable as a matter of law, the court stated that to be ancillary to a valid employment contract, the covenant had to be "subordinate to the contract's main purpose." 265 Ill.App.3d at 346, 202 Ill.Dec. at 573, 638 N.E.2d at 219. An at-will arrangement, subject to change at the whim of the employer, was not itself a valid employment contract. *Id.* at 348, 202 Ill.Dec. at 575, 638 N.E.2d at 221. And no separate written provisions covered the grounds for termination, or promised a definite term of employment in exchange for not competing

against the company. *Id.* at 348, 202 Ill.Dec. at 574, 638 N.E.2d at 220. From this, the court concluded, "Clearly, the covenant was not ancillary to an employment contract"; rather, it was a "naked agreement" to restrain trade. *Id.* at 348–49, 202 Ill.Dec. at 575, 638 N.E.2d at 221.

In contrast, *Abel v. Fox* held that an oral at-will arrangement is a valid contract or "relationship" that satisfies the ancillarity requirement. 274 Ill.App.3d at 820, 211 Ill. Dec. at 135, 654 N.E.2d at 597. Like Lorenz, defendant Fox was employed at will, and signed a covenant not to compete "sometime during her employment." *Id.* at 812, 211 Ill.Dec. at 130, 654 N.E.2d at 592. After she left that job, Fox began soliciting her former employer's customers to patronize her newly formed business, even though the noncompete forbade her from doing so. Reversing the trial court's dismissal of the employer's breach of contract claim, the appellate court relied on persuasive authority and older state supreme court precedent to support its holding that courts may enforce noncompetition agreements in at-will relationships. *Id.* at 816–21, 211 Ill.Dec. at 133–36, 654 N.E.2d at 595–98. The court roundly criticized *Creative Entertainment* as contrary to this authority and without basis in law or public policy. *Id.* at 818, 820, 211 Ill.Dec. at 134–35, 654 N.E.2d at 596–97. Whether written or oral, an at-will arrangement "is nonetheless an agreement and relationship with numerous consequences, imposing rights and obligations on both parties." *Id.* at 820, 211 Ill.Dec. at 135, 654 N.E.2d at 597. Even when supplemented by a noncompete, the primary purpose remains, as in term employment, establishing an employee-employer relationship. *Id.*

It is clear that these decisions create a split between two appellate districts over what kind of employment relationship is a valid foundation for a covenant not to compete. The Illinois Supreme Court has never addressed this issue, so this Court must choose between the appellate decisions. Two alternative approaches exist to facilitate this choice: predicting how the state supreme court would rule or applying the law of the

appellate district in which the federal court sits.

### III. Determining State Law When Appellate Decisions Conflict

█ Schmitt points out the irony that a second split exists, among judges in the Northern District of Illinois, over the appropriate method of determining state law under *Erie* when the state appellate districts are diametrically opposed on an issue and the supreme court is silent. Judge Shadur champions a geographical rule: following the district in which the federal court is located.[5] Judge Prentice Marshall, on the other hand, along with the majority of his peers, the Central District of Illinois, and arguably the Seventh Circuit, would make an effort to predict the state supreme court's stance.[6] Schmitt does not advocate one approach over the other, but maintains that either analysis would render the covenant unenforceable. This Court finds, however, that its *Erie* obligations are best discharged under the supreme-court-predictive approach, and further, that the supreme court would uphold the noncompete under the rule set forth in *Abel.*

Judge Marshall favors the predictive approach over the geographical approach for a number of reasons. First, he interprets *Erie* to require that federal courts sitting in diversity obey the state law that would ultimately apply were the case litigated to its fruition before the highest state court. *Roberts,* 568 F.Supp. at 539–40. Consequently, federal courts should not blindly follow an intermediate appellate ruling if convinced that the supreme court would disagree with it. *Id.* at 540. Second, the geographical approach has the effect of according state intermediate appellate decisions more weight in the federal system than in the state system. While a state appellate court can feel free, as it did here, to disagree with its sister court in another district, a federal court would be bound to the district in which it sits. *Id.* at 540–41. Moreover, a state appellate court may reexamine and overrule an earlier decision that later proved to be unsound. But a federal district court constrained by the geographic approach would be forced to adhere to the earlier erroneous opinion.[7] *Id.* at 542–43.

Ultimately, the geographical approach leads to forum shopping, precisely the evil *Erie* sought to prevent. *Id.* at 540–41; *Kelly,* 552 F.Supp. at 644–45. The Northern District's jurisdiction encompasses several counties, which in turn span more than one appellate district. *Kelly,* 552 F.Supp. at 644. Under the geographical approach, the federal court in the Northern District would have to apply caselaw from the First Appellate District, its neighbor in Cook County. *Id.* As a result, a litigant could "remov[e] to federal court actions, brought in non-Cook County areas of the Northern District of Illinois, in which it wants to avail itself of the law of the First District." *Id.* at 645. Besides facilitating such forum-shopping, this methodology deprives federal courts of their power to reason:

> When the rights of a litigant are dependent upon the law of a particular state, the court of the forum must do its best (not its worst) to determine what that law is. It must use its judicial brains, not a pair of scissors and a paste pot. Our judicial pro-

---

5. *See, e.g., KNS Co. v. Federal Ins. Co.,* 866 F.Supp. 1121, 1123 (N.D.Ill.1994); *Abbott Labs. v. Granite State Ins. Co.,* 573 F.Supp. 193, 196–200 (N.D.Ill.1983); *Commercial Discount Corp. v. King,* 552 F.Supp. 841, 847–52 (N.D.Ill.1982).

6. *See, e.g., Roberts v. Western–Southern Life Ins. Co.,* 568 F.Supp. 536, 539–45 (N.D.Ill.1983) (Marshall, J.); *Kelly v. Stratton,* 552 F.Supp. 641, 643–45 (N.D.Ill.1982) (Marshall, J.); *American Dental Ass'n v. Hartford Steam Boiler Inspection & Ins. Co.,* 625 F.Supp. 364, 366–67 (N.D.Ill. 1985) (Plunkett, J.); *Hultz v. Federated Mutual Ins. Co.,* 817 F.Supp. 59, 61–62 (C.D.Ill.1993); *see also Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 607 (7th Cir.1975) (Appellate court deci-

sions may be disregarded if federal court is convinced that state supreme court would rule otherwise).

7. Judge Marshall points out that this result is in contravention of the well-settled doctrine that a federal district court's construction of state law is entitled to great weight on appellate review when state courts have not authoritatively resolved the issue. *Roberts,* 568 F.Supp. at 543 n. 13 (citing *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 203–04, 76 S.Ct. 273, 276–77, 100 L.Ed. 199 (1956); *Lamb v. Briggs Mfg.,* 700 F.2d 1092, 1094 (7th Cir.1983)).

cess is not mere syllogistic deduction, except at its worst.

*Id.* (quoting Arthur Corbin, *The Laws of Several States,* 50 YALE L.J. 762, 775 (1941), *cited in Warner v. Gregory,* 415 F.2d 1345, 1346 (7th Cir.1969)).

Judge Shadur is concerned that the predictive approach has the potential to defeat litigants' justified expectations. *Commercial Discount,* 552 F.Supp. at 851. For example, a diversity plaintiff could sue in the Northern District, expecting the benefit of favorable law in the state's First Appellate District, only to be unfairly surprised when the federal court renders an adverse "prediction." *Id.* Nonetheless, we observe that if the case stayed in state court and its judgment was appealed by the defendant, the appellate court, equally able to change course, could likewise frustrate the plaintiff. Moreover, in the instant case, the predictive approach would not rob the plaintiff of substantive rights; surely AMI did not hope for this Court to apply the First District's law of restrictive covenants, since it is highly unfavorable to the company.

While Judge Shadur does make a well-reasoned case for the geographic approach in his *Commercial Discount* and *Abbott Laboratories v. Granite State Insurance Co.* opinions, we consider the predictive method more faithful to *Erie.* We think the Seventh Circuit would agree, given its statement that state appellate court decisions on questions of state law "provide us with data for ascertaining the relevant Illinois law, but may be disregarded if we are 'convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Gates Rubber Co.,* 508 F.2d at 607 (quoting *West v. AT & T,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)). Because we find that *Abel v. Fox* supplies such persuasive data, we predict that the state supreme court would follow its holding that an at-will employment relationship can serve as the basis for a covenant not to compete.

## IV. The Supreme Court Would Enforce the Restrictive Covenant

Guidelines do exist to aid the Court in predicting how the state supreme court would rule in this case. We begin with supreme court precedent, and examine authority on point, analogous cases, the policies and doctrinal trends that influenced those decisions, and the court's "considered dicta," in that order. *Roberts,* 568 F.Supp. at 544 (quoting *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 662 (3d Cir.1980)). "Of somewhat less importance" are decisions of lower state courts and other federal courts, which "should be accorded proper regard, of course, but not conclusive effect." *Id.* (internal quotations omitted). Research has revealed no supreme court decisions on point, but a number of cases evincing policy and doctrine that would inform the court's decision if faced with the issue before us. Moreover, the appellate court's opinion in *Abel* provides a compelling analysis grounded in this precedent and in persuasive authority.

As discussed in *Abel,* the Illinois Supreme Court has expressed its approval of restrictive covenants that protect the fruits of one party's efforts from unjust use by the other party. In *More v. Bennett,* 140 Ill. 69, 29 N.E. 888 (1892), the supreme court struck down a noncompetition and price-fixing agreement among stenographers in the city of Chicago. But in doing so, the court observed that:

An analogy is thereby sought to be raised between the contract in this case and those contracts in partial restraint of trade, which the law upholds.... Contracts in partial restraint of trade which the law sustains are those which are entered into by a vendor of a business and its goodwill with his vendee.... But in the present case there is no purchase or sale of any business, nor any other analogous circumstance giving to one party a just right to be protected against competition from the other.

*Id.* at 80, 29 N.E. at 891. Twenty-one years later, the supreme court reaffirmed this principle in *Union Trust & Sav. Bank v. Kinloch Long–Distance Tel. Co.,* 258 Ill. 202, 101 N.E. 535 (1913), adding that partial restraints of trade have usually been upheld where "a partner or employee has been restricted from competition with the partnership or employer to the injury of the busi-

ness." *Id.* at 207, 101 N.E. at 537. The court further observed that "[i]n all cases the restraint of trade has been auxiliary to the main purpose of the contract, and has been necessary to protect one party from injury by the unfair use of the subject-matter of the contract by the other party." *Id.* This broad language indicates that the supreme court will uphold restrictive covenants to protect an employer's investments, without regard to the nature of the employer-employee relationship.

Schmitt nevertheless argues that Illinois courts entertain a "general opposition to restrictive covenants," and for that reason, the supreme court would adopt the *Creative Entertainment* rationale to strike down Schmitt's noncompete. Def. Reply at 6–7. However, Schmitt cites not one supreme court case to support this contention, and in fact constructs a circular argument by relying exclusively on *Creative Entertainment. More* and *Union Trust's* modern progeny defy Schmitt's depiction of a "general opposition" to noncompetes. The supreme court has upheld a covenant restraining a veterinarian from practicing for five years within thirty miles of his former employer, finding the plaintiff's interest in protecting his clients a legitimate basis for the noncompete. *Cockerill v. Wilson,* 51 Ill.2d 179, 184, 281 N.E.2d 648, 651 (1972). The court sustained comparable restrictions on a doctor, observing that his former association provided new opportunities that he would not otherwise have had. *Canfield v. Spear,* 44 Ill.2d 49, 51–52, 254 N.E.2d 433, 434 (1969).

Not only does supreme court precedent support *Abel's* conclusion that employment relationships, no matter how configured, may be supplemented by noncompetes, but persuasive authority solidifies it. As *Abel* points out, section 187 of the Restatement (Second) of Contracts directly supports allowing noncompetes despite the absence of a written contract: "A promise to refrain from competition that imposes a restraint that is not ancillary to an otherwise valid transaction *or relationship* is unreasonably in restraint of trade." RESTATEMENT (SECOND) OF CONTRACTS § 187, at 38 (1979) (emphasis added). Comment b to section 187 explains that the promisee's interest may arise out of "a rela-

tion between himself as employer or principal and the promisor as employee or agent," and says nothing about the need for an employment contract setting forth specific terms of employment. Finally, comment g to section 188 is right on point: "A restraint may be ancillary to a relationship although, as in the case of an employment at will, no contract of employment is involved." RESTATEMENT (SECOND) OF CONTRACTS § 188 comment g, at 45 (1979).

These authorities, compiled in the *Abel* decision, recognize that pitting employment by contract against employment at will makes a distinction without a difference. The Seventh Circuit has said as much, noting that "[e]mployment at will is of course a valid contractual relationship." *Curtis,* 24 F.3d at 943. What matters in the ancillarity analysis is that noncompete be subordinate to the employer-employee relationship, which is no less valid or meaningful simply because it is at-will. As the *Abel* court correctly observes, at-will employment is a "relationship with numerous legal consequences, imposing rights and obligations on both parties." 274 Ill.App.3d at 820, 211 Ill.Dec. at 135, 654 N.E.2d at 597.

The facts in this case, viewed in the light most favorable to AMI and under the law that the supreme court would apply, demonstrate that Schmitt's noncompete was ancillary to the employment relationship. The purpose of the noncompete was not simply to restrain trade, but rather to protect AMI's customer base. Schmitt was allegedly the only employee at AMI capable of programming in the Progress language. In this capacity, she generated hundreds of thousands of dollars each year for AMI. When she departed, she deprived AMI not only of SJI's business, but the patronage of all AMI's other customers that had purchased the Progress/Varnet package, depending on AMI's expertise to implement it. Like the employer in *Cockerill,* AMI was entitled to prevent its clients from being appropriated by its former employee. And like the doctor in *Canfield,* Schmitt was presented opportunities by working at AMI, which trained her in the Progress language and introduced her to SJI, that she might not otherwise have had.

Schmitt argues that if we decline to follow *Creative Entertainment* and uphold her non-compete, we will be ignoring the "underlying evil" that the case attempts to cure. Def.Reply at 7. Specifically, such a decision would purportedly enable employers to ask an existing at-will employee to sign a restrictive covenant, fire the at-will employee right afterward, and still enforce the restrictive covenant. *Id.* This argument is without merit. It ignores the long line of cases, which our decision does not disturb, requiring continued employment for a substantial period after the employee signs the noncompete. An employer in the situation posited by Schmitt would clearly be unable to enforce the restrictive covenant for lack of consideration.

Our decision that the supreme court would favor the reasoning and result in *Abel* over *Creative Entertainment* is strengthened by the fact that *Creative Entertainment* cites no supreme court cases or persuasive authority for its conclusion, and is even inconsistent with one of its own earlier decisions. In *Agrimerica, Inc. v. Mathes*, the First District rebuffed challenges to a noncompete's consideration and ancillarity despite the fact the challenger was an at-will employee. 199 Ill.App.3d at 439, 442, 448, 145 Ill.Dec. at 590, 592, 596, 557 N.E.2d at 360, 362, 366. The court made no issue of the fact, as it did in *Creative Entertainment,* that the relationship was at-will, did not promise a specific period of employment, and was not embodied in a contract setting forth other employment terms and conditions.

In sum, *Creative Entertainment* is out of step with precedent, persuasive authority, and policy. Because we have determined that the supreme court would in all likelihood share our view, we decline to accept *Creative Entertainment's* invitation to adopt a legal perspective that would strike down all non-competes in at-will employment relationships. Rather, the enforceability of covenants not to compete in at-will arrangements is "based on the same rules which apply to any other post-employment noncompetition covenant made during an employment relationship." *Abel,* 274 Ill.App.3d at 820, 211 Ill.Dec. at 135, 654 N.E.2d at 597.

## CONCLUSION

For the foregoing reasons, defendant Schmitt's motion to dismiss Count II is denied.